**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **EDWARD T. WINDER,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civ. No. DLB-26-861** |
| **MCIJ WARDEN, *et al.*,** | * | |
| **Defendants** | * | |

# MEMORANDUM OPINION

On February 27, 2026, Edward T. Winder, who is confined to Jessup Correctional Institution ("JCI"), filed a civil rights complaint. ECF 1. Winder alleges that he was denied appropriate housing accommodations following major orthopedic surgery on his left knee, and as a result of the accommodations denial, he has fallen repeatedly, fracturing both hands. *Id.* at 4. Winder claims that when his left knee was "replaced/worked on . . . a bar [was] put in," the bar was removed at some point, and now prison staff refuse to "send [him] back to John[s] Hopkins to have the hard[]ware put back in because they . . . say [he] never had it put in[.]" *Id.* at 4–5. He adds that he contracted MRSA during one of his hospital stays. *Id.* at 5. He seeks monetary damages and to have his hands and "leg fixed." *Id.*

On March 16, the Court ordered counsel for the Division of Correction, a branch of the Maryland Department of Public Safety and Correctional Services ("DPSCS"), to show cause why injunctive relief should not be granted in favor of Winder "in light of the serious matters raised, which potentially impact Winder's safety and well-being." ECF 5, at 1. DPSCS filed a response, ECF 7, over 1,000 pages of medical records, and declarations of Warden Damean Stewart and DPSCS Deputy Secretary for Administration Oluwatoyin Bakare in support of their response, ECF 7-4, 7-5, 8, 8-1, 8-2. DPSCS also filed motion to seal the medical records, ECF 9, which is granted.

For the following reasons, the Court is satisfied that DPSCS has shown cause why emergency injunctive relief is unnecessary.

## I. Factual Background

The following facts are from Winder's medical records and a declaration from the Warden at JCI. ECF 7-4, 8, 8-1, 8-2.

On August 2, 2024, Winder underwent surgery to repair a fracture to his left kneecap. After a brief stay at the JCI infirmary, he was transferred to Maryland Correctional Institution Jessup ("MCIJ") at 11:55 p.m. on August 2, 2024. ECF 8, at 1209–10. When Winder arrived at MCIJ, his pain was 10 out of 10. *Id.* at 1210. Winder's gait was unsteady with crutches, and he was placed in a wheelchair for transfer to the housing unit. *Id.* Winder also was given Tylenol 3 and an antibiotic. *Id.* The nurse, Linda Fon, called the JCI infirmary and spoke with an unnamed nurse practitioner ("NP") and informed her that Winder would not be able to climb the stairs at MCIJ. *Id.* According to Fon's note, the NP insisted on sending Winder to MCIJ "even after Dr. Sing told NP to call him." *Id.*

At 12:59 a.m. on August 3, 2024, a medical emergency was called for C building, and Fon responded and found Winder on the floor in excruciating pain when she arrived. *Id.* at 1208. Winder was sent to Baltimore Washington Medical Center ("BWMC") after his fall because he complained of pain in his neck and the back of his head as well as to the surgical site on his left knee. *Id.* at 1207. While at the hospital, Winder had a CT scan of his head and cervical spine and an x-ray of his left knee. *Id.* at 1203. The results of those tests showed no intracranial abnormality, no fracture to his neck, and no dislocation or fracture to his knee. *Id.*; *see also* ECF 8-2, at 70–76. Winder was discharged from the hospital to the Metropolitan Transition Center ("MTC") infirmary on August 3, 2024. *Id.* at 12–15.

Winder's left leg swelled, was warm and very tender, and had a lateral bulge, so on August 23, 2024, he was sent to the Johns Hopkins Hospital emergency room. ECF 8, at 935. Winder returned to the MTC infirmary the following morning and was confined to a wheelchair. *Id*. at 930.

On August 27, 2024, Winder was admitted to Johns Hopkins Hospital for inpatient treatment to the surgical incision on his left knee, which was open with increased drainage. *Id.* at 911. Treatment included the "removal of hardware" in his knee, which had caused infection. *Id.* He received IV antibiotics and was being prepared for "washout and potential closure." *Id*. Winder returned from Johns Hopkins Hospital to the JCI Infirmary on September 12, 2024, with a peripherally inserted central catheter ("PICC") line in place for him to receive the vancomycin he was prescribed to treat the infection. *Id*. at 893–94; ECF 8-2, at 7. He continued to receive IV antibiotics at the JCI infirmary. ECF 8-2, at 8.

On September 19, 2024, Winder was sent to Howard County General Hospital because his PICC line was not functioning and he could not receive his IV antibiotics. ECF 8-1, at 47–48. The PICC line was replaced, and a note was made that an experienced nurse would need to perform dressing changes to prevent it from being dislodged again. *Id*.

As of September 23, 2024, Winder had missed five doses of vancomycin; the nursing staff was advised to resume administering the medication as ordered immediately. He had been approved for an orthopedic follow-up, which had not yet been scheduled. ECF 8, at 720. The end date for administration of vancomycin was extended to October 15, 2024, due to the missed doses. *Id*. at 540.

On October 15, 2024, a plan for Winder's discharge from the JCI infirmary was entered into his medical record. ECF 8 at 323–24. His status at the time was "non-weightbearing," and he was using a wheelchair. *Id*. at 324. He had completed the course of IV antibiotics to treat the staph

infection, his condition had improved, and the incision to his knee was well healed. *Id*. He remained in the infirmary for an additional three days before being discharged. *Id*. at 280–81. Winder was still using a wheelchair on the day he was discharged to general population. *Id*. at 281.

On December 4, 2024—when Winder was no longer using the wheelchair—he reported to medical because he fell and injured his knee. *Id.* at 267–68. The nurse who treated him referred him to a provider and noted there was no swelling or bruises but there was a decrease in range of motion. *Id*. at 268. Three days later, Winder was seen for the injury to his knee caused by the fall. *Id*. at 257–58. He was prescribed several pain medications including Neurontin and oxycodone, and an x-ray of his knee was ordered.[1] *Id*. Winder was issued a wheelchair on December 16, 2024. ECF 8-2, at 1. On December 24, 2024, Wincer was issued a Rollator. *Id.* at 15.

On January 31, 2025, Winder was brought to the infirmary after he fell "trying to get off the toilet" and "in an attempt to catch himself he wedged himself on his right hand and hurt his . . . right index finger." ECF 8, at 221. Winder's finger was swollen and painful. *Id*. His finger was immobilized with a splint, and he was scheduled to see a provider the following day. *Id*. He also was issued a wheelchair that day. ECF 8-2, at 13. The following day, during a chronic care visit, Winder stated that the pain in his finger had increased and that he believed it was broken and that the bone had shifted. ECF 8, at 215. Because of his severe pain, Winder was sent to an emergency room that day. *Id*. at 207. An x-ray of his finger showed a chronic dislocation with "no indication for reduction." *Id*. at 203. It was recommended that he follow up with an orthopedic hand specialist. *Id*. His injured finger was taped to the finger next to it for comfort. *Id*.

---

[1] One of Winder's diagnoses is staphylococcal arthritis of his left knee. ECF 8, at 210, 247. This condition is also known as septic arthritis and is described as "a painful infection in a joint" that "can come from germs that travel through the bloodstream from another part of the body." *See* https://www.mayoclinic.org/diseases-conditions/bone-and-joint-infections/symptoms-causes/syc-20350755 (last visited Oct. 22, 2026).

On February 5, 2025, Winder was evaluated for medication and fall precaution. *Id.* at 198. At that time, he was prescribed oxycodone and Neurontin, and he was provided with documentation authorizing his placement in a handicapped accessible cell as a "fall precaution" because he had balance issues and was wheelchair bound. *Id.*; ECF 8-2, at 33. The form is signed by Dr. Muleta Obsu. ECF 8-2, at 33.

Winder was approved for and began receiving physical therapy on approximately July 15, 2025. ECF 8, at 121-22, 129-30, 150.

Winder fell again on July 26, 2025, when he was outside. *Id.* at 142–43. He claimed he felt lightheaded before he fell, and he attributed the fall to the heat. *Id.* at 143. He did not report sustaining an injury from this fall, nor did he attribute the fall to a lack of assistive devices or assignment to an improper housing unit. *Id.*

A notation in Winder's September 16, 2025 medical record states that he has a history of a fracture of his finger. *Id.* at 124.

On October 16, 2025, a walker was ordered for Winder because he complained the pain in his left knee was worsening. *Id.* at 113. On November 30, 2025, Winder reported that his left knee pain was aggravated by climbing and descending stairs, moving, walking, and standing. *Id.* at 106. A follow-up with chronic care providers for further evaluation was planned. *Id.*

On December 22, 2025, Winder fell while using a walker and injured his left hand. *Id.* at 98. His hand was swollen, and Winder stated his left knee was painful. *Id.* His hand was immobilized with an ace wrap, a cold compress was applied, and he was given a pass to see a provider the following day. *Id.* Winder's hand was x-rayed that week, but the results were not reviewed with him until January 2, 2026. *Id.* at 88–89. The x-ray revealed that Winder had a fracture of his "distal 5th metacarpal with volar angulation, suggestive of a boxer's fracture." *Id.*

at 88. It was noted that the fracture was "likely related to trauma." *Id.* An orthopedic referral was submitted for approval. *Id*. The next day, Winder was seen by an orthopedic specialist on an urgent basis for the fracture to his finger, with a notation that the fracture was 10 days old. *Id*. at 78–79. The consultation orders noted that the fracture was "immobilized today." *Id.* at 78.

In a March 30, 2026 declaration, JCI Warden Stewart stated that Winder now is housed in a single occupancy cell that is designated as ADA-handicapped accessible. ECF 7-4, ¶ 3. The declaration, the medical records, and DPSCS's response to the Court's March 16 Order were sent to Winder on March 30, 2026. ECF 7, at 19. Winder has not filed anything in response to these filings.

## II. Discussion

The Court ordered DPSCS to show cause why immediate injunctive relief was not necessary to protect Winder's safety and well-being. In response, DPSCS states that Winder is not in immediate harm.

Preliminary injunctive relief "is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *see MicroStrategy Inc v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (noting preliminary injunctions "involve[e] the exercise of very far-reaching power to be granted only sparingly and in limited circumstances" (citation modified). Preliminary injunctions serve "to prevent irreparable harm during the pendency of a lawsuit so as to preserve the court's ability to render a meaningful judgment on the merits." *Erie Ins. Exch. v. Md. Ins. Admin.*, 105 F.4th 145, 148 (4th Cir. 2024) (citation modified). They also serve "to protect the movant, during the pendency of the action, from being harmed or further harmed in the manner in which the movant contends it was or will be harmed through the illegality alleged in the complaint." *Omega World Travel, Inc. v. Trans*

*World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997). A plaintiff seeking such relief must meet "a high bar" by "[s]atisfying . . . four factors." *SAS Institute, Inc. v. World Programming Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017). The four factors are: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm if the Court denies preliminary relief; (3) that the balance of equities favors him; and (4) that an injunction is in the public interest. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The "irreparable harm must be neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citation modified).

When a prisoner seeks injunctive relief that would affect the management of a correctional institution, the Court should grant the request only under extraordinary and compelling circumstances, "so as not to assume the role of prison administrators." *See Taylor v. Freeman*, 34 F.3d 266, 269–70 & n.2 (4th Cir. 1994). Additionally,

> [p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in [18 U.S.C. § 3626(a)] (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under [18 U.S.C. § 3626] (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

18 U.S.C. § 3626(a)(2) (permitting court to "enter a temporary restraining order or an order for preliminary injunctive relief" in a "civil action with respect to prison conditions").

Upon consideration of the voluminous medical records produced by DPSCS, the Court is satisfied that DPSCS has shown that Winder does not need immediate medical attention or accommodations to prevent irreparable harm. He is housed in a handicapped accessible cell, and

he is receiving medical care for his reported injuries. The hardware in his knee was removed due to infection, and there is no indication in the medical records that it needed to be replaced. No emergency injunctive relief to prevent irreparable harm to Winder is necessary.[2]

## III. Conclusion

DPSCS has satisfactorily responded to the Court's March 16, 2026 Show Cause Order. The defendants shall be served and respond to Winder's complaint as outlined in the accompanying Order, which follows.

November 3, 2026
Date

Deborah L. Boardman
United States District Judge

[2] In its response to the show cause order, DPSCS also noted that Winder has not exhausted his administrative remedies—a prerequisite for filing claims in this Court. *See* 42 U.S.C. § 1997e(a). The administrative remedy process ("ARP") that applies to all Maryland prisons begins with filing an ARP request with the prison's managing official. Md. Code Ann., Corr. Servs. §§ 10-206 – 10-210; COMAR 12.07.01.03 – 12.07.01.08. If the prisoner's ARP request is dismissed, they can challenge the decision by filing an appeal with the Commissioner of Corrections. If the prisoner is dissatisfied with the result when they complete that procedure, they may file a grievance with the Inmate Grievance Office ("IGO"). The IGO may refer the complaint to an administrative law judge ("ALJ") for a hearing or dismiss it without a hearing if it is "wholly lacking in merit on its face." If the IGO dismisses the complaint, its dismissal serves as a final agency determination. If the complaint is referred to an ALJ, the ALJ provides a proposed decision to the Secretary of DPSCS. The Secretary, in turn, makes a final agency determination. If the defendants raise the affirmative defense of failure to exhaust administrative remedies, the Court may order Winder to produce evidence that he exhausted his administrative remedies. If he does not, his claims may be subject to dismissal or summary judgment. *See Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016).